IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

06CV5556
JUDGE SHADUR
MAG. JUDGE KEYS

JERRY A. COYNE,
    Plaintiff,
v.
UNIVERSITY OF CHICAGO,
    Defendant.

Jury Trial Demanded

## COMPLAINT

Plaintiff, Dr. Jerry A. Coyne, by and through his attorney, as and for his complaint against the University of Chicago, states as follows:

**FILED**
OCT 1 2 2006
OCT 12 2006
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

### The Parties

1. Plaintiff, Jerry A. Coyne, Ph.D. is presently and at all times relevant hereto has been a tenured professor in the Department of Ecology and Evolution and the Collegiate Division of Biological Sciences of the University of Chicago. At all times material hereto, Dr. Coyne performed his duties for the University satisfactorily and had a recognized expertise in evolutionary biology and genetics. For over 20 years, during his tenure with the University, Dr. Coyne successfully submitted proposals to the National Institute of Health ("NIH") for federal funding of his research in this area and, as a result of his proposals, the University was awarded federal funds, including federal funds which funded the research at issue here.

2. Defendant, the University of Chicago is a not for profit corporation incorporated in the State of Illinois with its principal place of business in Chicago, IL. Defendant received funding from the NIH to fund the research at issue here. As a result of this research, the University was a joint actor with the federal government and, as a precondition to receiving the federal funds involved in the research here, was required to have and maintain written policies

1

and procedures that met the requirements set forth in federal regulations, including adhering to such requirements in conducting academic fraud investigations at issue in the instant case.

3. Defendant, the University of Chicago is the Plaintiff's employer.

4. At all times relevant, Dr. Chung-I Wu was the Chairman of the Department of Ecology and Evolution at the University of Chicago and Dr. Coyne's immediate superior and supervisor with control over terms and conditions of Dr. Coyne's employment.

## Jurisdiction

5. This suit is authorized and instituted pursuant the Civil Rights Act, 42 U.S.C. Section 1983 and 1988, the First and Fourteenth Amendments to the United States Constitution, and Title 28 U.S.C. 2201 conferring upon any court of the United States jurisdiction to declare the rights and other legal relations of any interested party in cases where there is an actual controversy within its jurisdiction.

6. Jurisdiction of this Court is provided under 28 U.S.C. Section 1331, 1343, and 2201 and this Court's supplementary jurisdiction relating to pendant state claims.

7. Venue is proper in this judicial district pursuant to 28 U.S.C. Section 1391(b) and (c) because the Defendant resides in and does business in this district, and all of the events upon which this Complaint is based occurred in this district.

## Allegations Common to All Counts

8. Plaintiff has been a tenured faculty member at the University of Chicago since 1986.

9. On or about June 24, 2002, the University of Chicago renewed Dr. Coyne's faculty tenured appointments as Professor in the Department of Ecology & Evolution and in the Collegiate Division of Biological Sciences and to the Universities' Committees on Evolutionary Biology and Committee on Genetics for the period July 1, 2002 through June 30, 2003.

2

10. On or about June 30, 2003, the University of Chicago renewed Dr. Coyne's faculty tenured appointments as Professor in the Department of Ecology & Evolution and in the Collegiate Division of Biological Sciences and to the Universities' Committees on Evolutionary Biology and Committee on Genetics for the period July 1, 2003 through June 30, 2004.

11. Dr. Coyne's appointment letters made clear that the University's Faculty Handbook is a part of the University's written contract of employment with Dr. Coyne. The tenure appointments for each of the terms noted in paragraph 9 above stated that "some of the major terms and conditions of your employment at the University of Chicago" were "subject to (1) provisions of the Statutes of the University, as adopted or amended by the University's Board of Trustees, and other administrative policies of the University".

12. At all times relevant to the actions and events at issue in this complaint, under Illinois law, the promises and policies contained in the University of Chicago employee handbook promising Dr. Coyne legal representation in the face of an academic fraud investigation and indemnification of, among other things, his attorneys' fees and costs incurred in connection with such an investigation and in defense thereof created enforceable contractual rights where as here they were expressly made a part of Dr. Coyne's terms and conditions of employment at the start of each tenure appointment and which were expressly and reasonably relied on by Dr. Coyne in his continued employment with the University. Moreover, at times relevant hereto, under applicable Illinois law, any ambiguities in these policies are construed against the University, the drafter of the provisions in the Handbook.

13. Specifically, at all times relevant to the actions and events at issue in this complaint, *The University of Chicago Faculty Handbook* promised in pertinent part that:

"Section VI: Indemnification

3

> Since October, 1981, the University Board of Trustees have directed that:
> It is the policy of the University of Chicago to defend and indemnify all University of Chicago faculty and professional employees for damages which the employee may be legally obligated to pay because of any act or omission arising out of the performance of professional services by the employee on behalf of the University and within the scope of the employee's duties and responsibilities. Dishonest, fraudulent, criminal or malicious acts or omissions of any employee are not covered by this policy.
>
> Coverage shall include attorneys' fees and costs incurred in connection with the investigation and defense of any covered claim or cause of action. The University may investigate and settle any claims it deems reasonable, and reserves the right to choose the attorneys."

14. At all times relevant to the actions and events at issue in this complaint, *The University of Chicago Faculty Handbook* provided the University Policy, Procedures, and Guidance Concerning Academic Frauds, which policies and procedures were required to conform to federal regulations governing federally funded research and provisions relating to protections for the accused, and, in pertinent part, stated:

> "Introduction:
>
>> Academic fraud is a threat to the intellectual integrity on which the advancement of knowledge depends. Academic fraud can taint the reputation of the University and of its honest scholars and researchers . . . . "
>> and
>
> "Section 4: Investigation Into The Fact of Fraud:
>
>> \* \* \*
>
> *B. 2. Rights of the Person Charged*
>
>> . . . The party charged shall have the right to be accompanied by a lawyer or any other person at any proceeding in which the party charged has a right to be present . . ."

15. The Policy provides that the institution's officials conducting the inquiry and if warranted an investigation will take interim administrative action appropriate to protect Federal and other funds and ensure that the purposes of any Federal or other financial assistance are

4

being carried out. Section I, General Considerations.

16. The policy states further that the University's Policy "seeks to insure proper investigation of all charges, "while providing an important check against sustaining false charges and protecting individuals responsible for the investigation from allegations of bias." Any investigation made pursuant to this section determines only whether fraud has been committed; "it has no disciplinary functions, . . ." (Part II of the University Policy).

17. Moreover, at times relevant hereto, under applicable Illinois law, ambiguities in these policies were construed against the University, the drafter of the provisions in the Handbook.

18. In or about February 2003, Dr. Anthony J. Greenberg, Jennifer R. Moran and Dr. and Professor Chung -I Wu of the University of Chicago's Department of Ecology and Evolution requested that Dr. Coyne perform certain biochemical analyses on their transgenic (genetically altered) lines of fruit flies to determine if the transfer of genes had been successful with the stipulation that Dr. Coyne would be a co-author if any paper resulting from this collaboration were submitted to a scientific journal.

19. Thereafter, in or about February 2003, Dr. Coyne performed the requested tests and provided the results and data to Dr. Greenberg.

20. In or about December 2003, an article based upon Drs. Wu and Greenberg and Ms. Moran's work titled "Ecological Adaptation During Incipient Speciation Revealed by Precise Gene Replacement" was published in the journal, *Science*. (December 5, 2003, Volume 302, pp. 1754-1757). Dr. Coyne co-authored the work. Funding for the work was provided by National Institutes of Health ("NIH") grants to Dr. Chung-I Wu and Dr. Coyne and an NIH National Research Service Award fellowship to Dr. Anthony Greenberg.

5

21. As a result of the NIH funding, the research that produced the article was subject to the Department of Health and Human Services ("HHS") guidelines relating to research misconduct.

22. In or about July 6, 2004 through December, 2004, Dr. Coyne and his assistant Ms. Susannah Elwyn performed tests of mating discrimination and cold and starvation resistance not previously performed by him on the transgenic lines submitted to him by Dr. Chung-I Wu, Dr. Greenberg and Ms. Moran, and found that, contrary to the results of the work performed by Dr. Chung -I Wu, Dr. Greenberg, and Ms. Moran and described in the *Science* paper, the effects of the transfer of genes on cold and starvation resistance could not be replicated, undermining major results and conclusions of the article Dr. Coyne had been asked to co-author in *Science*.

23. In or about late November 2004, Dr. Coyne informed his Chairman and co-author and collaborator, Dr. Wu, that he (Dr. Coyne) had been unable to replicate the environmental tolerance results of Dr. Wu, Dr. Greenberg, and Ms. Moran underlying the *Science* article and that he (Coyne) would be forwarding a manuscript of a proposed article for the scientific journal, *Evolution*, that addressed the discrepancy between that research and his (Coyne's) findings.

24. In or about December 3, 2004, Dr. Coyne forwarded to Drs. Wu and Greenberg and Ms. Moran, a manuscript of a proposed article titled "Does The *Desaturase-2* and Locus in *Drosophila Melanogaster* Cause Adaptation and Sexual Isolation?" (co-authored by Ms. Elwyn) for publication in the journal *Evolution*, which further research and article stated that Dr. Coyne could not replicate the effects on environmental stress tolerance of the transgenic lines which were the subject of the December 2003 article in *Science*. These findings undermined the results Drs. Greenberg and Chung -I Wu and Ms. Moran claimed to have

6

achieved in their transgenic research. Dr. Coyne proposed to Dr. Wu that he (Dr. Wu), Dr. Greenberg, and Ms. Moran co-author this article with Dr. Coyne.

25. In or about January 5, 2005, Dr. Coyne submitted the article to *Evolution* with co author Susannah Elwyn of his laboratory; that article was accepted for publication in and around March 13, 2005. Dr. Coyne's article reporting discrepancy in research results underlying the *Science* article constituted an expression about matters of public concern, to wit: the accuracy and integrity of research in the public domain on the subject of evolutionary biology.

26. On or about March 21, 2005, Dr. Wu conceded to Dr. Coyne that he, Dr. Greenberg and Ms. Moran knew "where the big discrepancies came from". Instead, however, of agreeing to co-author Dr. Coyne's article in which the research discrepancies were noted and in retaliation for Dr. Coyne's exercise of his free speech rights in submitting for publication the accepted *Evolution* article, the three caused Dr. Coyne to be referred to the University for Investigation, wholly without basis and on the ground that Dr. Coyne's article included experiments on mating discrimination which they alleged were stolen, when, in truth and in fact, as they well knew at the time, Dr. Coyne had been engaged in experiments on mating discrimination in populations of these flies since 1999. This referral was done in retaliation for Dr. Coyne's *Evolution* article criticizing Dr. Wu's, Dr. Greenberg and Ms. Moran's research and was designed to and had the purpose and effect of infringing on Dr. Coyne's free speech, by suspending the publication of Dr. Coyne's *Evolution* article disclosing unrepeatable research results reported by Dr. Wu, Dr. Greenberg and Ms. Moran. Moreover, Dr. Wu, Dr. Greenberg and Ms. Moran well knew that they themselves could not replicate their former results.

27. Moreover, despite the fact that on or about August 3, 2005, the Office of Research Integrity ("ORI") for HHS concluded that the alleged conduct of Dr. Coyne did not constitute

research misconduct under the appropriate standards, and despite the University's own policy that any investigation should cease should it become clear that academic fraud was not involved, the University nevertheless proceeded with its investigation, only to conclude on or about October 12, 2005 after suspension of the publication of Dr. Coyne's article revealing the errors in Dr. Wu, Greenberg and Ms. Moran's research, that Dr. Coyne did not engage in academic fraud but, nevertheless, recommending that his *Evolution* article not be published.

28. Dr. Coyne incurred in excess of $115,000 in reasonable attorneys' fees and costs in defending against the baseless academic fraud investigation instigated by Dr. Wu, Dr. Greenberg and Ms. Moran. Despite repeated requests and demands made by Dr. Coyne upon the University for reimbursement of attorneys' fees and costs under its indemnification policy, the University has persisted in its refusal to reimburse Dr. Coyne for his attorneys' fees and costs incurred in the investigation.

29. Moreover, in or about December 2005, in furtherance of the defendant's efforts to infringe on Dr. Coyne's freedom of speech, to deprive him of his protectable and contractual property interests in being reimbursed for his attorneys fees and costs, and as further harassment, Dr. Wu recommended to the dean that Dr. Coyne be granted only a 0.9% increase for the 2006-2007 academic year. At that time, the average increase for the Department was 2%, making the 0.9% increase well below average. The dean adopted Dr. Wu's recommendation despite the fact that there was no basis to conclude that Dr. Coyne's performance was substantially less than his peers. Indeed, upon a protest, reviewed by someone other than Dr. Wu, Dr. Coyne was later granted a 3% increase, reflecting the fact that his performance was in fact above average.

## COUNT I

## 42 U.S.C. Section 1983
## Deprivation of Property Interests In Violation of the Fourteenth Amendment Due Process Clause

30. Plaintiff Dr. Coyne incorporates herein as if fully set forth paragraphs 1-29 of this Complaint as and for paragraphs 1-29 of Count I.

31. Plaintiff Dr. Coyne had a contractual and legitimate property interest and claim of entitlement to indemnification for attorneys' fees and costs incurred in connection with the University's investigation and Dr. Coyne's defense of academic fraud allegations.

32. This contractual and legitimate claim for indemnification and payment of attorneys' fees and costs constitute a protectable property interest that cannot be taken away without due process.

33. In the instant case, despite Dr. Coyne, by the acts of defendant, has been intentionally deprived of his contractual and property interests in and to indemnification and reimbursement of his attorneys fees and costs, without due process in that Plaintiff's repeated requests for indemnification and reimbursement under the terms of his contract with the University have been arbitrarily, maliciously and wilfully refused.

34. Plaintiff performed and continued to perform all conditions precedent to his contractual duties as a tenured professor with the University of Chicago.

WHEREFORE, Plaintiff respectfully requests that this Court declare and mandate that the University of Chicago is in violation of his contractual obligations by failing and refusing to honor its contractual obligations to indemnify Plaintiff's reasonable attorneys fees and costs incurred in connection with the University's academic fraud investigation, declare that the University has arbitrarily and maliciously and without due process refused and failed to honor its contractual obligation has deprived Plaintiff of his protectable property interest without due

process and continues to refuse to pay Dr. Coyne's reasonable attorneys' fees and costs under the indemnification provision and award Plaintiff in excess of $250,000 in actual, compensatory, and punitive damages as well as attorneys fees and costs incurred in connection with redressing the violation of his constitutional rights, and such other relief as this court deems just and proper.

## COUNT II

### 42 US.C. Section 1983
### Deprivation of First Amendment Rights
### To Exercise Free Speech Free From Retaliation

35. Plaintiff Dr. Coyne incorporates herein as if fully set forth paragraphs 1-34 of this Complaint as and for paragraphs 1-34 of Count II.

36. Plaintiff Dr. Coyne's First Amendment right to exercise his freedom of speech in publicizing the discrepancies in research underlying a published article was well established and defendant's actions in pursuing a baseless academic fraud complaint which resulted in suppressing Coyne's reporting of these findings were not objectively reasonable.

37. Dr. Coyne's speech, contained in his article titled "Does The *Desaturase-2* and Locus in *Drosophila Melanogaster* Cause Adaptation and Sexual Isolation?" for publication in the journal *Evolution* was in the public interest as it touched upon a matter of public concern that was the subject of published research and, thus, was not speech in his capacity as an employee of the defendant, but, rather, as a citizen expressing the results of his personal research on disputed matters of public opinion. Indeed, defendant's own policies recognized academic integrity is crucial to the advancement of knowledge. Moreover, in the instant case, public NIH monies received by Dr. Coyne as well as Drs. Wu, Greenberg and Ms. Moran funded the research underlying the Science article. Under these circumstances, the defendant

did not have an adequate justification for treating Dr. Coyne's report of testing results as contained in the Evolution article differently from any other publication by a member of the public and University. Persisting in a baseless academic fraud investigation which involved suppressing Dr. Coyne's Evolution article and report of test results is not a reasonable restriction on Dr. Coyne's speech. The result is among other things to deprive the public of informed opinions on issues of public importance; to wit: the accuracy of a widely cited scientific paper dealing with issues of evolutionary biology.

38. Despite Dr. Wu's admission of these discrepancies, and in violation of these rights, defendant conducted a baseless academic fraud investigation initiated by Ms. Moran in concert with Drs. Wu and Greenberg as a means of retaliating against and suppressing and infringing on Dr. Coyne's right to publish an article detailing the discrepancies between results of Dr. Coyne's and that of Ms. Moran's, Dr. Wu's and Dr. Greenberg's transgenic research.

39. Moreover, even after the Office of Integrity of Research Integrity of the National Institutes of Health found no evidence of academic fraud, the University persisted in its investigation, ultimately concluding that Dr. Coyne did not engage in academic fraud but succeeding in delaying publication of his article revealing the discrepancies in Dr. Wu's, Dr. Greenberg's and Ms. Moran's research in violation of Dr. Coyne's first amendment right.

Further, even after clearing Dr. Coyne of the academic fraud investigation, the defendant recommended that Coyne's article revealing the discrepancy in results between Dr. Coyne's test results and that of Dr. Wu, Dr. Greenberg and Ms. Moran not be published, thereby suppressing the fact that important scientific result could not be replicated.

40. Defendant acted knowing and intelligently and with reckless disregard of Dr. Coyne's First Amendment rights, by infringing upon Dr. Coyne's free speech.

11

WHEREFORE, Plaintiff respectfully requests that this Court declare and mandate that the University of Chicago is in violation of his First Amendment rights of free Speech by conducting and continuing a baseless investigation into alleged academic fraud designed to infringe on Dr. Coyne's free Speech rights, and award Plaintiff in excess of $250,000 in actual, compensatory, and punitive damages as well as attorneys fees and costs incurred in connection with redressing the violation of his constitutional rights, and such other relief as this court deems just and proper.

## COUNT III

### Breach of Contract

41. Plaintiff Dr. Coyne incorporates herein as if fully set forth paragraphs 1-40 of this Complaint as and for paragraphs 1-40 of Count III.

42. Plaintiff Dr. Coyne's contract with the University included the Faculty Handbook provision granting the right to indemnification for attorneys' fees and costs incurred in connection with the University's investigation and Dr. Coyne's defense of academic fraud allegations.

43. Dr. Coyne relied on this promise of indemnification as a term and condition of his employment and his continued employment with the University as a tenured professor.

44. In the instant case, moreover, the Faculty Handbook created a specific right for Dr. Coyne to employ counsel in defending against academic fraud allegations.

45. Plaintiff has made repeated demands upon defendant for payment of his attorneys' fees and costs incurred by him in defending against the University's academic fraud investigation and defendant has repeatedly refused to honor its contractual obligations.

46. Plaintiff has performed all conditions precedent to exercising his contractual claim to indemnification.

WHEREFORE, Plaintiff respectfully requests that this Court award him his contractual right to indemnification for his attorneys' fees and costs incurred in connection with his defense of the University's academic fraud investigation.

RESPECTFULLY SUBMITTED,

PLAINTIFF JERRY A. COYNE

BY: _____

Susan Bogart
Law Offices of Susan Bogart
30 North LaSalle St., Ste. 2900
Chicago, IL 60602
(312) 263-0900 ext. 7014
SBogart514@aol.com